IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**ANGELA ELLEN DAIN**,

               Plaintiff                        Civil No. 10-6104-ST

        v.                            **FINDINGS AND RECOMMENDATION**

**MICHAEL J. ASTRUE**,
Commissioner of Social Security,

               Defendant.

STEWART, Magistrate Judge:

     Plaintiff, Angela Dain ("Dain"), seeks judicial review of the Social Security

Commissioner's final decision denying her applications for Disability Insurance Benefits ("DIB")

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act

1 -  FINDINGS AND RECOMMENDATION

("Act"). This court has jurisdiction under 42 USC § 405(g). For the following reasons, the Commissioner's decision should be reversed and remanded for the immediate calculation and award of benefits.

## PROCEDURAL BACKGROUND

Born in 1980, Dain alleges disability since May 12, 2004, due to neurofibromatosis,[1] migraine headaches, depression, and anxiety. Tr. 112, 172.[2] Dain reports that she completed one year of college (Tr. 179), but also states that she completed only the eleventh grade and was in special education. Tr. 46. According to her work history, she worked sporadically in child care and retail positions from May 2004 through December 2006. Tr. 160.

After the Commissioner denied Dain's applications initially and upon reconsideration, an Administrative Law Judge ("ALJ") held a hearing on August 26, 2009. Tr. 26-59. On September 30, 2009, the ALJ found Dain not disabled. Tr. 13-23. The Appeals Council accepted additional evidence into the record, but denied review of the matter on February 26, 2010. Tr. 1-5. The Appeals Council decision is a final decision of the Commissioner, subject to review by this court. 20 CFR § 410.670a.

///

///

///

///

---

[1] Neurofibromatosis is a genetic disorder of the nervous system. The condition may cause tumors to grow on nerves, and also causes skin changes and deformed bones. See National Institute of Health, "Neurofibromatosis," *available at* http://www.nlm.nih.gov/medlineplus/neurofibromatosis.html (last visited May 11, 2011).

[2] Citations to "Tr." refer to indicated pages in the official transcript of the Administrative Record filed with the Commissioner's Answer on September 20, 2010 (docket # 7).

2 - FINDINGS AND RECOMMENDATION

## BACKGROUND

### I.    Medical Record

#### A.    Evidence Before the ALJ

The medical record begins in June 2003 when Dain visited the Emergency Room and received treatment for dental pain.  Tr. 266.  Other than a subsequent Emergency Room visit in October 2003 for acute bronchitis (Tr. 261-62), the record shows no further medical treatment before July 22, 2004, when Dain again visited the Emergency Room complaining of calf pain. Tr. 253-54.  Physicians diagnosed neurofibromatosis and a superficial thrombosis.  Tr. 254.  Dain returned to the Emergency Room again on July 25, 2004, and received the same diagnoses. Tr. 245-46.

On October 6, 2004, Dain visited an urgent care clinic and complained of a mass on her ankle and associated pain.  Tr. 340.  The attending physician noted Dain's history of neurofibromatosis and stated that he did not know whether the mass was related to this disorder or her history of "superficial phlebitis," and referred Dain to an orthopedist.  *Id.*

Psychologist William McConochie, Ph.D., evaluated Dain for Disability Determination Services ("DDS") on December 6, 2004.  Tr. 270-74.  He noted Dain's report that her "current work related problems include depression, social anxiety and fears, especially around many people."  Tr. 270.  Dr. McConochie also noted Dain's report of being abducted and beaten at age 14, raped at 16, losing a child at birth at age 18, and losing another child to state protective services at age 19.  *Id.*  Based on Dain's history of neurofibrotoma and migraines, interview and test behavior, Dr. McConochie diagnosed early onset dysthymia, and generalized anxiety

disorder.  Tr. 274.  He did not assign a Global Assessment of Functioning score (*id*), and indicated that Dain was not capable of handling any funds awarded to her.  Tr. 269.

Orlando Conty, M.D., saw Dain for difficulty sleeping and migraine headaches on January 4, 2005.  Tr. 377.  He diagnosed migraine headaches and insomnia.  *Id.*

On July 7, 2005, DDS examining psychologist Bill Hennings, Ph.D., found "insufficient evidence" to complete a Mental Residual Functional Capacity evaluation.  Tr. 238-40.

Dain received treatment for various upper respiratory tract infections and related disorders throughout 2005.  Tr. 330, 337-38.  A February 27, 2006, abdominal ultra sound showed soft tissue lesions from her neurofibromatosis, as well as pregnancy.  Tr. 346-47.  Dain received prenatal care, including fetal lung surgery for fetal hydrops, between February 10 and April 5, 2006, when she had a cesarean delivery of an infant that died.  Tr. 279-325.

Dr. Conty saw Dain on April 20, 2006, when he diagnosed neurofibromatosis, with secondary "painful skin lesions on feet."  Tr. 376.  He gave Dain a painkiller prescription and referred her to a plastic surgeon.  *Id.*

Dain was hospitalized January 6-9, 2007, for urosepsis and suspected pyelonephritis.  Tr. 368-69, 448-49.  Her discharge sheet also notes a diagnosis of depression.  *Id.*  Dain returned to the Emergency Room with nausea and vomiting on January 10, 2007, and was treated for her ongoing pyelonephritis infection.  Tr. 365-66, 446-47.

On January 14, 2007, Dain visited the Emergency Room complaining of flank pain and a migraine headache.  Tr. 362-64, 443-45.  An MRI showed no kidney calcification, but a possible "inflammatory process or recently passed renal stone."  Tr. 388-90.  On January 18, 2007,

4 - FINDINGS AND RECOMMENDATION

Samantha Newbold, M.D., diagnosed back strain, which she attributed to the effects of being bedridden during the recent hospitalization.  Tr. 375.

Dain again visited the Emergency Room on January 28 and February 28, 2007, and was diagnosed with neurofibromatosis, depression, and migraines.  Tr. 356, 359-60, 439-42.

Dr. Newbold diagnosed Dain with migraine headaches on March 5, 2007.  Tr. 399.  A March 16, 2007, brain MRI was normal.  Tr. 386, 403.  A March 23, 2007, MRI of Dain's pelvis showed a nodule that "would be most consistent with a functional cyst."  Tr. 385.

On May 17, 2007, based on a review of the records, DDS psychologist Paul Rethinger, Ph.D., completed a Psychiatric Review Technique form, finding that Dain had "moderate" limitations due to anxiety, depression, post-traumatic stress disorder, and personality disorder.  Tr. 410-22.

Internist Kurt Brewster, M.D., evaluated Dain for DDS on June 11, 2007.  Tr. 424-33.  He examined Dain and also reviewed an Emergency Room note dated July 25, 2004, and Dr. Conty's treatment notes dated January 4, 2005, and April 20, 2006.  Tr. 425.  He diagnosed neurofibromatosis, found that Dain could walk or stand six hours in an eight-hour day, assessed no sitting limitations, and found that Dain could lift ten pounds frequently and a maximum of 20 pounds.  Tr. 431-32.

Dain again visited the Emergency Room on June 18, 2007, complaining of dysuria and back pain.  Tr. 437.  Physicians again diagnosed acute pyelonephritis.  Tr. 438.

On June 28, 2007, based on a review of the records, DDS reviewing physician Richard Alley, M.D., completed a Physical Residual Functional Capacity Assessment.  Tr. 450-57.  He concluded that Dain could occasionally lift 20 pounds, frequently lift ten pounds, stand or walk at

least two hours in an eight-hour workday, and sit about six hours in an eight-hour workday.  Tr. 451.  He assessed no limitations in balancing, stooping, kneeling, crouching, or crawling, and no manipulative, visual, communicative, or environmental limitations.  Tr. 453.  Dr. Alley concluded that "objective findings does [sic] support some allegations but not all to the extent alleged."  Tr. 455.

B.      **Evidence Before the Appeals Council**

Following her August 26, 2009 hearing, Dain submitted additional records to the Appeals Council.  Tr. 464.   Some, but not all, of these chart notes duplicate prior records.  The Appeals Council declined review of the ALJ's decision (Tr. 1), but accepted the additional evidence into the record.  Tr. 5.

1.      **Legal Standards and Analysis**

The Commissioner asserts that this court cannot consider the records submitted to the Appeals Council after the hearing before the ALJ because the Appeals Council denied review of the matter.  The Commissioner cites regulations and caselaw pertaining to the standards under which the Appeals Council considers new evidence in making its decision.   However, the Appeals Council expressly accepted the evidence into the record.  Tr. 5.

Dain does not challenge the Appeals Council decision, but asserts only that this court should consider the evidence the Appeals Council accepted into the record.  The Commissioner's analysis fails to acknowledge this distinction.  A court's review of the administrative record explicitly includes review of additional evidence accepted into the record by the Appeals Council.  *Ramirez v. Shalala*, 8 F3d 1449, 1452 (9th Cir 1993).  Therefore, this court must consider evidence submitted to the Appeals Council in its review of the ALJ's decision.

2.    **Evidence Accepted by the Appeals Council**

The additional records accepted by the Appeals Council show treatment of Dain's

neurofibromatosis between August 16, 2004, and November 9, 2009. *Id.*

Before the hearing, on August 16, 2004, Kimberly J. Herder, M.D., noted a possible

neurofibrotoma tumor on Dain's knee. Tr. 500. Dr. Conty again diagnosed migraine headaches

on January 4, 2006. Tr. 500. Dain saw Dr. Conty again on April 20, 2006, complaining of

painful bumps on her feet. Tr. 499. He found "painful skin lesions on feet bilaterally secondary

to neurofibromatosis," and referred Dain to a plastic surgeon for further evaluation. *Id.* On

March 16, 2007, Dr. Newbold diagnosed an ovarian cyst, migraines, depression, and PTSD.

Tr. 490.

On October 7, 2009, after the hearing, David Zollinger, M.D., saw Dain for headaches

and back pain following a motor vehicle accident two weeks earlier. Tr. 484. He diagnosed a

concussion with postconcussive syndrome, cervical and low back strain, and migraine headaches.

*Id.* On October 23, 2009, Dr. Zollinger again diagnosed headaches and back pain. Tr. 480. He

noted Dain's history of neurofibromatosis and severe headaches and was "unclear" whether

Dain's back pain was related to the motor vehicle accident "or if it is neurofibromatosis related."

*Id.*

An MRI of Dain's brain on October 27, 2009, showed an incidental "focus" which is

"commonly seen in cases of neurofibromatorsis type I." Tr. 476. A lumbar spine MRI on the

same day showed "enhancing masses consistent with neurofibromas" in the left S3 and right L3

nerve roots. Tr. 478. It also showed "multiple additional smaller cutaneous enhancing

neurofibromas" on Dain's back. *Id.*

Dr. Zollinger again treated Dain for headaches on November 9, 2009. Tr. 475. He described this as "headache triggered by sinusitis has migrainous qualities," and prescribed antibiotics and painkillers. Tr. 475.

A November 13, 2009 MRI of Dain's cervical spine showed "mildly dysmorphic C4 and C5 corresponding to findings on conventional radiographs and most likely developmental in nature. These could be related to known neurofibromatosis." Tr. 466. The exam also showed mild cervical kyphosis and skin abnormalities "very local associated with known neurofibromatosis type I." Tr. 466-67.

## II. Dain's Testimony

### A. April 9, 2007 Function Report

In a Function Report dated April 9, 2007 (Tr. 198-205), Dain wrote that on most days she awakens at 10:30 a.m., watches television, reads, and will "lay in bed all day" when she does not "feel good." Tr. 198. She feeds her fish, but her mother cleans the fish tank. Tr. 199. Due to tumors on her feet, body and scalp, she finds it hard to get comfortable, cannot wear shoes or stand in the shower, and has difficulty brushing her hair. *Id.*

Dain requires reminders from her mother and uses a timer on her watch to remind her to take medication. Tr. 200. She can fix sandwiches and TV dinners when she is home alone, but cannot stand long enough to cook. *Id.* Dain makes her bed and picks her clothes up off the floor when her mother tells her to do these things. *Id.* She has "a lot" of pain if she stands or bends over too much. Tr. 201. Dain does not shop because she has no money and does not leave the house. *Id.*

Dain indicated physical limitations in lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and stair climbing, and endorsed mental limitations in memory, completing tasks, concentration, and getting along with others. Tr. 203. She cannot pay attention or feed herself when she has a headache. Tr. 199, 203.

Dain uses a cane "only when it start[s] to hurt" and has a prescription for glasses which give her headaches. Tr. 204.

At the end of the questionnaire, Dain wrote: "I have had tumors all my life and migraines. I have lost 2 babys [sic] at birth and have been attacked 2 times which add to my fears and depression." Tr. 205.

### B.    Pain Questionnaire

Dain also completed an undated Pain Questionnaire. Tr. 193-95. She wrote that she has "sharp pain, burning, tingling, and aching" all over her body which is constant and may last for days. Tr. 193. Walking, standing, and sitting worsens her pain. *Id.* She can be active for 20 minutes before requiring rest and can no longer "work, stand and sit." Tr. 194. She "occasionally" goes for walks of two blocks, requires assistance in washing her clothes and cleaning her bedroom, and does not cook. Tr. 195.

### C.    August 26, 2009 Hearing Testimony

At the August 26, 2009, hearing before the ALJ, Dain testified that she experiences migraine headaches which are a "blinding pain that I can't really see. I can't think. I can't talk." Tr. 32. These headaches occur once per week or every other week, causing her to lay down in a dark room. Tr. 32-33. She takes no prescription medication for her headaches because she has no medical insurance. Tr. 33.

9 - FINDINGS AND RECOMMENDATION

She has not had regular medical treatment since 2006 and no mental health treatment, other than counseling after being abducted at age 15. Tr. 34. She is "scared" and cannot be in public unless accompanied by someone she knows. Tr. 34-35. She also has difficulty remembering tasks and remaining focused. Tr. 36.

Regarding her neurofibrotoma tumors, Dain stated that she had 20 or 25 surgically removed, and that "more than half of those have grown back." Tr. 36. She cannot wear regular shoes due to tumors on her feet. *Id.* The tumors on her knees make walking painful, and the tumors on her hips, especially near her sciatic nerve, are "really painful." Tr. 37. After walking or standing for 15 minutes, she normally will "go and lay down because my legs will hurt . . . ." Tr. 38. The tumors on her lower back and hips hurt, and she "can't normally" be comfortable in a seated position. *Id.* After sitting for approximately two hours, she must lay down for 30 minutes. Tr. 38-39. When the tumor on her neck is "bumped" in everyday occurrences, it causes her "whole body to go into pain and it takes about an hour or so for the pain to go away." Tr. 37.

Regarding her past relevant work, Dain stated that she was "slow" in her motel cleaning job, and that if she "overdid it" she would become tired and have headaches and increased pain. Tr. 44. She had multiple workplace absences due to headaches. Tr. 45.

## III.   <u>Third-Party Testimony</u>

Dain's mother, Teresa Morrison, completed a Third Party Function Report on April 7, 2007. Tr. 185-92. Morrison lives with Dain, and when she returns from work in the evening, she finds Dain either watching television or laying down with a migraine headache. Tr. 185. Dain could stand for 45 minutes prior to the onset of her disability, but can no longer do so. Tr. 186.

10 - FINDINGS AND RECOMMENDATION

Morrison also wrote that Dain's depression, migraines, and tumors interfere with her sleep. *Id.* The tumors on her feet and between her toes make it hard for Dain to wear shoes and stand in the shower. *Id.* She has tumors on her head which make it difficult to brush her hair. *Id.* The tumors also make it difficult for Dain to shave. *Id.*

Morrison wrote that "with her depression she sometimes does not have the will to get up[.] I tell her she needs to get up." Tr. 187. Dain prepares her own sandwiches, but due to the tumors on her feet, cannot stand long enough to prepare other meals. *Id.* She cleans her room which takes her 15-20 minutes. *Id.* Dain cannot do other housework because of her migraines, depression, and inability to stand due to tumors. Tr. 188. She is capable of shopping, but "freaks out" if there are "too many people around." Tr. 188. In addition, Dain's depression and "no money" keep her at home. *Id.*

Dain's friends visit her, and she does not go out much due to her tumors. *Id.* Dain cannot be alone because she was attacked, and she goes out less since her alleged disability began. *Id.*

Morrison indicated that Dain has physical limitations in lifting, squatting, standing, reaching, walking, sitting, kneeling, and stair climbing, and endorsed mental limitations in memory, completing tasks, concentrating, and getting along with others. Tr. 190. Dain cannot stand long because of her tumors, and her migraines interfere with her memory and ability to pay attention. *Id.* Morrison also wrote that Dain has difficulty following written instructions due to poor eyesight and glasses do not help her much. Tr. 191. Finally, Morrison made the following remarks:

> She was born with neurofibromatosis, she has hundreds of tumors. She has migraines because of her discs. She has learning disabilities. Since she was kidnapped and attacks [sic], she has depression and phobias. She has lost 2 babies at 2 mos along

> which adds to her depression.  After her kidnapping [and] attack
> she quit school.  She has tumors between her toes, on the bottoms
> of her feet.  She has them on every part of her body.  This year she
> had cervical cancer, plus tumors on her ovaries.  She has a 50%
> chance of her tumors being cancerous.  Now her face is getting
> more tumors.  She also has high blood pressure and clots.

Tr. 192.

## DISABILITY ANALYSIS

The Commissioner engages in a sequential process encompassing between one and five steps in determining disability under the meaning of the Act.  20 CFR §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity.  If she is, the claimant is not disabled.  20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the twelve month duration requirement.  20 CFR §§ 404.1509, 404.1520(a)(4)(ii), 416.909; 416.920(a)(4)(ii).  If the claimant does not have such a severe impairment, she is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the impairment is determined to equal a listed impairment, the claimant is disabled.

If adjudication proceeds beyond step three the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite limitations imposed by her impairments.  20 CFR

§§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

The ALJ uses this information to determine if the claimant can perform her past relevant work at step four.  20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant can perform her past relevant work, she is not disabled.  If the ALJ finds that the claimant's RFC precludes performance of her past relevant work, or that the claimant has no past relevant work, the ALJ proceeds to step five.

At step five the Commissioner must determine if the claimant is capable of performing work existing in the national economy.  *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR §§ 404.1520(a)(4)(v), 404.1520(f), 416.920(a)(4)(v), 416.920(f).  If the claimant cannot perform such work, she is disabled.  *Id.*

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show that "the claimant can perform some other work that exists in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id* at 1100.  If the Commissioner meets this burden the claimant is not disabled.  20 CFR §§ 405.1520(g), 416.920(g).

**THE ALJ'S FINDINGS**

At step one, the ALJ found that Dain had not performed substantial gainful activity since her alleged onset date.  Tr. 15.  The ALJ found Dain's neurofibromatosis, headaches, depression, and generalized anxiety disorder to be severe impairments at step two, but found that they did not meet a listed impairment at step three.  Tr. 15-18.  The ALJ subsequently found that Dain retained the RFC to perform a "reduced range of exertionally sedentary work" (Tr. 18), but could

not perform her past relevant work at step four.  Tr. 21.  At step five, the ALJ found that Dain could perform work in the national economy as an "addresser," "taper," and "sorter."  Tr. 22.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Batson v. Comm'r for Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004).  "Substantial evidence" means "more than a mere scintilla, but less than a preponderance."  *Bray v. Comm'r of the Soc. Sec. Admin*, 554 F3d 1219, 1222 (9th Cir 2009), quoting *Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

This court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  The reviewing court may not substitute its judgment for that of the Commissioner.  *Id*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading.  *Id.*; *see also Batson*, 359 F3d at 1193.

## FINDINGS

Dain challenges the ALJ's evaluation of her credibility and that of a lay witness.  She also asserts that the ALJ had a duty to develop the record by ordering a consultative mental health evaluation.

///

## I.    Dain's Credibility

Dain asserts that the ALJ inappropriately rejected her testimony regarding her

neurofibromatosis tumors and headaches.

### A.    Legal Standards

The ALJ must consider all symptoms and pain which "can be reasonably accepted as

consistent with the objective medical evidence, and other evidence."  20 CFR §§ 404.1529(a),

416.929(a).  Once a claimant shows an underlying impairment which may "reasonably be

expected to produce pain or other symptoms alleged," absent a finding of malingering, the ALJ

must provide "clear and convincing" reasons for finding a claimant not credible.  *Lingenfelter*,

504 F3d at 1036, citing *Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996).  The ALJ's

credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did

not arbitrarily discredit the claimant's testimony."  *Thomas v. Barnhart*, 278 F3d 947, 958 (9th

Cir 2002), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th Cir 1991) (*en banc*).

The ALJ may consider objective medical evidence and the claimant's treatment history,

as well as the claimant's daily activities, work record, and observations of physicians and third

parties with personal knowledge of the claimant's functional limitations.  *Smolen*, 80 F3d at

1284.  The ALJ may additionally employ ordinary techniques of credibility evaluation, such as

weighing inconsistent statements regarding symptoms by the claimant.  *Id.*  The ALJ may not,

however, make a negative credibility finding "solely because" the claimant's symptom testimony

"is not substantiated affirmatively by objective medical evidence."  *Robbins*, 466 F3d at 883

(citations omitted).

///

B.    **Analysis**

The ALJ found that Dain's "statements concerning the intensity, persistence and limiting effects of symptoms are not credible to the extent they are inconsistent with the [RFC] assessment." Tr. 19.  Because there is no evidence of malingering, the ALJ must provide clear and convincing reasons to reject Dain's statements.  To support the credibility finding, the ALJ specifically discussed Dain's testimony regarding her neurofibroma tumors on her feet, her alleged inability to sit, and her absences from work due to her headaches.

1.    **Neurofibroma Tumors**

The ALJ found Dain's testimony that walking is difficult due to the tumors on her feet to be inconsistent with the medical evidence.  Tr. 20.  The ALJ based this finding upon examining physician Dr. Brewster's June 2007 opinion which "showed 'scattered neurofibromas' on the feet, but no effusion or erythema," "no disturbance of gait," and an ability to "tandem walk and heel walk." *Id.*

Although these citations to Dr. Brewster's opinion are accurate, they are incomplete. Dr. Brewster also noted Dain's complaint of pain in her feet from her tumors, found "evidence of surgical removal" of neurofibromas and noted that "[a]pproximately 3 on each foot is [sic] painful." Tr. 428.  He also found that Dain "could inconsistently do tiptoe walk, stating, 'I have pain everywhere including legs, knees, hip.'" Tr. 429.

These findings do not show that Dr. Brewster found Dain's ability to walk unimpeded by her neurofibromas.  Instead, they confirm the presence of painful neurofibromas on her feet. Notably, Dr. Brewster did not address how painful Dain's foot tumors made it for her to walk or how far or long she could walk.  Thus, citing Dr. Brewster's opinion is not clear and convincing

support for rejecting Dain's testimony that she had trouble walking and could not stand for long periods due to tumors on her feet.

2.    **Sitting Limitation**

The ALJ found Dain's testimony inconsistent regarding her alleged sitting limitation. Tr. 20. When asked how long she can sit, Dain testified that, "I can sit about through . . . a movie," but this is "really pushing it." Tr. 38. The ALJ later asked her why her telemarketing job ended, and Dain replied, "the sitting, I started getting blood clots in my legs." Tr. 40. The ALJ concluded that Dain testified she left her telemarketing job "because she started getting blood clots in her legs from sitting. Said testimony suggests she is unable to engage in prolonged sitting due to blood clots and such assertion is not credible." *Id.* The ALJ then found that "comparison of her allegations with the medical record yields inconsistencies," and discussed Dain's treatment for thrombophlebitis.[3] *Id.*

Dain asserts that this analysis misconstrues her testimony, pointing to her earlier testimony addressing sitting and an October 27, 2009, MRI that showed neurofibromatoris lesions on her lumbar spine. Tr. 38, 478. The Commissioner responds that these citations are inappropriate because they rely upon Dain's testimony and evidence submitted to the Appeals Council after the ALJ's decision, but fails to address the ALJ's reasoning.

Not only does the post-hearing evidence submitted to the Appeals Council support Dain, but the ALJ also erred by relating Dain's alleged inability to sit to her testimony about blood clots in her legs. Though Dain stated that she had blood clots at the time she left her

---

[3] Thrombophlebitis is swelling and inflammation of a vein caused by a blood clot. *See* National Institute of Health, "Thrombophlebitis," *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002098 (last visited May 10, 2011).

telemarketing job, she did not state that she cannot sit due to blood clots, or that such limitation is the basis of her allegation of disability. Instead, she clearly related her inability to sit to her painful tumors.

The ALJ may not selectively read the record. *See Howard v. Barnhart*, 341 F3d 1006, 1012 (9th Cir 2003). Here, the ALJ drew an unwarranted inference from Dain's testimony in order to then reject her testimony. This court must sustain an ALJ's inferences reasonably drawn "from the record." *Batson*, 359 F3d at 1193. Because the ALJ misconstrued Dain's testimony regarding the reasons for her alleged sitting limitations, this is not a clear and convincing reason for finding her not credible.

### 3.    **Headaches**

Finally, the ALJ rejected Dain's testimony that she missed work due to headaches. Tr. 20. The ALJ found that the medical record "reveals a rather narrow period of treatment" for headaches, citing treatment notes in January and February 2007. *Id.* The ALJ found that the medical record addressed "headache frequency in the untreated state," but found it "reasonable to conclude that treatment directed at headaches complaints is likely to result in diminution of symptom frequency and severity." *Id.* The ALJ also found that the record showed no treatment for headaches since June 2007. *Id.*

The record shows that Dain reported headaches to medical providers in January 2005, January-March 2007, and October-November 2009. Tr. 356, 359-60, 377, 439-42, 399, 475, 480. Dain testified at her hearing that she experienced headaches once a week, or every other week, throughout the period she claims disability. Tr. 32-33. She explained that she does not take medication for her headaches because she has no medical insurance and is not eligible for

the Oregon Health Plan.  Tr. 33.  Finally, Dain testified that she has not had regular medical care

since 2006 because she cannot afford it.  Tr. 34.

The ALJ may not chastise a claimant for failing to follow treatment she cannot afford.

*Gamble v. Chater*, 68 F3d 319, 321 (9th Cir 1995).  The record shows that Dain received

treatment for headaches beyond the period indicated by the ALJ and that she could not afford

treatment for much of the period under review.  One would not expect a claimant to routinely

visit the Emergency Room for a known and regular headache condition.  Thus, the ALJ's finding

that Dain failed to seek treatment for her headaches is not based upon the proper legal standards.

Furthermore, the ALJ's statement regarding the expected effect of "treatment directed at

headaches" (Tr. 20) is speculative.  This court cannot determine the effect of any treatment on

Dain's headaches.  This reasoning also again infers that Dain should be chastised for failing to

seek treatment for her headaches, and should not be sustained.

### C.    Credibility Conclusion

By failing to provide clear and convincing reasons for rejecting Dain's symptom

testimony, the ALJ erred.

## II.    Lay Witness Testimony

Dain asserts that the ALJ erroneously omitted the testimony submitted by her mother,

Teresa Morrison.

### A.    Legal Standards

The ALJ has a duty to consider lay witness testimony.  20 CFR §§ 404.1513(d),

404.1545(a)(3), 416.913(d), 416.945(a)(3); *Stout v. Comm'r*, 454 F3d 1050, 1053 (9th Cir 2006

(citations omitted).  Friends and family members in a position to observe the claimant's

symptoms and daily activities are competent to testify regarding the claimant's condition.  *Stout*,

454 F3d at 1053.  The ALJ may not reject such testimony without comment and must give

reasons germane to the witness for rejecting her testimony.  *Bruce v. Astrue*, 557 F3d 1113, 1115

(9th Cir 2009, citing *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir 1996).

  **B.**  **Analysis**

   In finding that Dain could perform a reduced range of sedentary work, the ALJ did not

cite or discuss Morrison's testimony.  This court may not affirm silent omission of lay witness

testimony unless it can confidently conclude that no reasonable ALJ, when fully crediting the

omitted testimony, would reach a different disability conclusion.  *Stout*, 454 F3d at 1055-56.

   Morrison stated that Dain cannot stand, be in crowds or be alone.  Tr. 186-88.  She also

indicated that Dain has physical limitations in lifting, squatting, standing, reaching, walking,

sitting, kneeling, and stair climbing, as well as mental limitations in memory, completing tasks,

concentrating, and getting along with others.  Tr. 190.  She also stated that Dain has difficulty

reading written instructions due to poor eyesight.  *Id.*

   The ALJ discussed Dain's alleged difficulties in social functioning and in concentration,

persistence, and pace, and concluded that they were moderate.  Tr. 17.  The ALJ rejected the

more significant "marked" category "as it is clear that [Dain] interacts with others and is not

confined to her home due to symptomatic limitations of a mental impairment.  No specific

difficulties with interpersonal relationships have been identified."  *Id*.  The ALJ's questions to

the vocational expert limited Dain to "no interaction with the general public" and to "superficial"

interaction with coworkers.  Tr. 53.

According to Morrison, Dain rarely leaves the house, cannot be alone, and "freaks out" if there are too many people around her. Tr. 188-89. Morrison also stated that Dain's memory is impaired by her migraines. Tr. 190. Although she did not indicate the frequency of Dain's migraines, Dain said she suffered them weekly or every other week.

While the ALJ limited Dain's public interactions, he failed to account for Morrison's testimony that Dain cannot be alone. The ALJ also improperly evaluated Dain's migraine headaches, as discussed above. Fully crediting Morrison's testimony that Dain cannot stand for long, is incapable of independently leaving the house, suffers headaches and has memory deficits, would lead to a different RFC assessment, which in turn would prompt different vocational expert testimony regarding Dain's ability to perform work in the national economy at step five in the sequential proceedings. In such circumstances, this court cannot "confidently conclude" that fully crediting Morrison's omitted testimony would result in the same disability determination under the *Stout* standard. The ALJ's omission of Morrison's testimony is therefore erroneous.

### III.    The ALJ's Duty to Develop the Record

Dain asserts that the ALJ failed in his duty to develop the record by rejecting her request to order a consultative mental health examination to update the one prepared over four years earlier in December 2004 by Dr. McConochie.

#### A.    Legal Standards

The claimant must provide evidence relating to his impairments and their severity. 20 CFR §§ 404.1512(a) & (c), 416.912(a) & (c). However, the ALJ has a duty to develop the record when the claimant's onset date is ambiguous, or when the record is too inadequate for the

Commissioner to make a proper disability determination.  20 CFR §§ 404.1513(e), 416.913(e);

*Bayliss v. Barnhart*, 427 F3d 1211, 1217 (9th Cir 2005); *Armstrong v. Comm'r*, 160 F3d 587, 590

(9th Cir 1998).   The Ninth Circuit also instructs that, "the ALJ is required to make a reasonable

effort to obtain a case evaluation, based on the record in its entirety, from . . . a[n] appropriate

specialist, rather than simply constructing his own case evaluation from the evidence in the

record."  *Howard*, 341 F3d at 1014.  Evaluation by DDS reviewing physicians may satisfy this

requirement, if the record shows that they are qualified specialists.  *Id.*

> **B.    Analysis**

The ALJ rejected Dain's request for a consultative mental health evaluation, explaining:

> As discussed herein, a full psychological evaluation was obtained
> at the Administration's request in December 2004.  Subsequent
> evidence fails to provide an objective indication that signs and
> symptoms consistent with a mental disorder have subsequently
> worsened or imposed additional limitation.

Tr. 19.

The ALJ also found that Dain described mental symptoms "to medical sources only

sporadically and [those] statements did not indicate constant symptoms of an extensively limiting

nature."  *Id.*

The Commissioner's regulations do not suggest that a claimant is entitled to receive

multiple consultative examinations addressing the same impairment.  Instead, the regulations

allow a claimant to submit further evaluations.  20 CFR §§ 404.1512(a) & (c), 416.912(a) & (c).

Further, the record shows that DDS psychologists constructed a case evaluation

pertaining to Dain's mental health on May 17, 2007.  Tr. 406-09.  This evaluation, however

superficial, constitutes a case evaluation by a specialist as directed by the Ninth Circuit.  *Howard*,

341 F3d at 1014.  The ALJ therefore had no further obligation to develop the record by obtaining

another mental health evaluation.

## IV.    **Step Five Findings**

Finally, Dain asserts that the ALJ erroneously found that she could perform work in the

national economy at step five in the sequential proceedings.

At step five, the ALJ may draw upon a vocational expert's testimony to show that

claimant can perform work in the national economy.  *Tackett*, 180 F3d at 1101.  The ALJ's

questions to the vocational expert must include all properly supported limitations.  *Osenbrock v.*

*Apfel*, 240 F3d 1157, 1165 (9th Cir 2001).  Here, the ALJ propounded hypothetical questions to

the vocational expert based upon an RFC assessment which did not properly consider the

limitations described in Dain's testimony, the medical evidence, and the lay witness testimony.

Tr. 550-51.  Thus, the vocational expert's response to these questions is without probative value,

and the ALJ's step five finding should not be sustained.

## V.    **Remand**

### A.    **Standard**

The decision whether to remand for further proceedings or for immediate payment of

benefits is within the discretion of the court.  *Moore v. Comm'r*, 278 F3d 920, 926 (9th Cir 2002).

The issue turns on the utility of further proceedings.  A remand for an award of benefits is

appropriate when no useful purpose would be served by further administrative proceedings or

when the record has been fully developed and the evidence is insufficient to support the

Commissioner's decision.  *Strauss v. Comm'r*, 635 F3d 1135, 1138 (9th Cir 2011), quoting

*Benecke v. Barnhart*, 379 F3d 587, 593 (9th Cir 2004).  The court may not award benefits

punitively, and must conduct a credit-as-true analysis to determine if a claimant is disabled under the Act. *Id.*

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id.* The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but allows flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F3d 871, 876 (9th Cir 2003), citing *Bunnell v. Sullivan*, 947 F2d 341, 348 (9th Cir 1991).

### B.   Analysis

The ALJ failed to properly evaluate the testimony by Dain and her mother and to properly assess Dain's alleged mental impairments. The ALJ's subsequent RFC assessment is therefore not based upon the proper legal standards. This satisfied the first prong under the "crediting true" analysis.

In determining whether to award benefits or remand the matter for further proceedings, the court next must determine whether "outstanding issues remain in the record." *Strauss*, 635 F3d at 1138. Though Dain asserts that the ALJ should have developed the record by ordering a mental health consultative examination, she does not assert that the record requires development before an award of benefits. The Commissioner makes no argument that the record should be further developed. Thus, the second prong of the "crediting as true" analysis is met.

24 - FINDINGS AND RECOMMENDATION

Turning to the third prong, the court must determine whether crediting the improperly omitted evidence establishes that Dain is disabled.  Dain testified that she had between two and four workplace absences per month due to her headaches.  Tr. 45.  She also stated that she must recline for 30 minutes after sitting for approximately two hours.  Tr. 38-39.  Her mother testified that she cannot stand for more than a few minutes at a time.  Tr. 186.

Neither the ALJ nor Dain's counsel solicited testimony from the vocational expert regarding the remaining limitations described by Dain's mother.  However, the improperly assessed evidence pertaining to Dain's workplace absences and need to recline, as assessed by the vocational expert, requires a finding of disability.  The vocational expert stated that an individual missing more than "a few" days of work per month would be unable to sustain employment in the national economy.  Tr. 57.  The vocational expert also stated that an individual who must recline for 30 minutes every two hours would be unable to sustain employment.  Tr. 58.

In such circumstances, the improperly rejected evidence should be credited.  *Hammock v. Bowen*, 879 F2d 498, 503-04 (9th Cir 1989) (crediting as true erroneously rejected testimony).  The credited testimony establishes that Dain may not perform work in the national economy at step five in the sequential proceedings.  Consequently, Dain is disabled under the Commissioner's regulations.

///

///

///

///

25 - FINDINGS AND RECOMMENDATION

## RECOMMENDATION

For these reasons, the Commissioner's final decision should be REVERSED and REMANDED pursuant to Sentence Four of 42 USC § 405(g) for the immediate calculation and award of benefits.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due June 9, 2011.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 23rd day of May, 2011.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge